2006 UT 72

**Kathryn COLLARD, Trustee of the LeRoy Collard Trust, Plaintiff and Appellee,**

v.

**NAGLE CONSTRUCTION, INC., a Utah corporation; Gary M. Nagle, an individual, and Marilyn F. Nagle, an individual, Defendants and Appellants.**

No. 20050714.

Supreme Court of Utah.

Nov. 17, 2006.

Kathryn Collard, Salt Lake City, for plaintiff.

Sean N. Egan, Salt Lake City, for defendant.

DURHAM, Chief Justice:

¶ 1 This case is before us on appeal from the Third District Court. Defendant Nagle Construction, Inc. (Nagle) challenges the trial court's order awarding it damages in the form of an offset for amounts owed under a Uniform Real Estate Contract by the LeRoy Collard Trust.[1] The issue before us is whether the district court abused its discretion in fashioning the equitable remedy awarded below; we hold that it did not.

## BACKGROUND

¶ 2 On March 30, 1978, Leroy Collard (Collard) and Nagle signed a Uniform Real Estate Contract (UREC) for the sale of a condominium unit located in Salt Lake City. Under Addendum 1 to the UREC, Collard purchased the property for $100,500 to be paid under the following conditions: Collard was to make an initial payment of $10,000, assume a mortgage on the property for $59,958.75, and tender 55,000 shares of stock in Utah Coal and Chemical Corporation to make up the remaining balance of approximately $30,000. Importantly, Addendum 1 also stipulated that Nagle would deliver title

to the premises to Collard once Nagle had verified that the stock was marketable and could be sold at a price sufficient to cover the remaining $30,000 balance. The UREC specified that any party in default of any of the covenants or agreements "shall pay all costs and expenses, including a reasonable attorney's fee."

¶ 3 Collard paid Nagle the initial $10,000 and began making mortgage payments, although Collard never actually assumed the mortgage as required by the UREC.[2] Collard also took possession of the property, made improvements, and paid property taxes. Collard recorded notice of the UREC on May 18, 1979. Nevertheless, Nagle considered Collard in default for failing to assume the mortgage and threatened Collard with foreclosure proceedings.

¶ 4 In an attempt to reconcile their conflict, Collard and Nagle negotiated Addendum 2 to the UREC. Addendum 2 reads as follows:

Title of premises being sold under the contract referred to above will be transferred when Nagle Construction Company sells sufficient of the shares of Utah Coal and Chemical Corp. transferred under addendum # 1 to realize $85,000 cash. [Nagle] hereby agrees to sell shares sufficient to realize $85,000 within 1 year of receipt thereof providing the market value of said shares will cause a realization of $85,000. Should the value of the 55,000 shares conveyed not equal $85,000 within 1 year, [Collard] agrees to convey additional shares of Utah Coal and Chemical Corp. stock or cash sufficient to bring the total value conveyed to [Nagle] to $85,000 before [Nagle] conveys title to premises sold to [Collard].

In September 1979, approximately eighteen months after the UREC was signed, Collard delivered 105,000 shares of Utah Coal and Chemical Corporation to Nagle.[3]

---

1. Kathryn Collard as Trustee for the Leroy Collard Trust brought this appeal as the successor-in-interest to Leroy Collard.

2. Collard's request to assume the mortgage was denied by the lending institution.

3. Although the UREC and its addenda specified only 55,000 shares, the district court found that Collard had in fact delivered 105,000 shares. The district court stated that given the historical value of the shares, 55,000 shares would not have been adequate to realize the $85,000 value required under Addendum 2, and that the record

¶ 5 During the year following the receipt of the 105,000 shares of stock, Nagle never made any attempt to sell them. In fact, Nagle inquired as to the value of the stock through its accountant only once during that year. Nagle never provided Collard with any information as to whether the price of the stock had reached $85,000, despite several conversations regarding the transaction.

¶ 6 On January 13, 1981, sixteen months after Collard's delivery of the shares, Nagle sent Collard a letter claiming Collard had breached the agreement because the value of the shares had not reached $85,000 during the year following receipt. However, Nagle did not specify the amount of the deficiency. Collard responded, contending that the shares had indeed reached a value of $85,000 during the designated year. Neither party took further action until 1999. During those eighteen years, Collard and his successors continued to occupy the condominium, paid the mortgage and taxes, and made improvements. While refinancing the property in 1986, Collard received a notice stating that the title remained in Nagle's name. Collard attempted to change the title to reflect his name three years later but was unsuccessful.

¶ 7 On July 28, 1999, the Leroy Collard Trust (the Trust) [4] brought suit against Nagle seeking declaratory relief to quiet title to the condominium in its name, claiming breach of contract and adverse possession. Nagle counterclaimed, seeking forfeiture, foreclosure, and a quiet title order. Motions for summary judgment were filed by both parties.

¶ 8 The district court held that the statute of limitations barred both parties' legal claims and ordered that an equitable hearing be held in August 2000. At the hearing, the district court ruled that the UREC was binding on the parties, but was subject to a six-year statute of limitations. As a result, the district court held that Nagle's counterclaims were barred because Nagle had not acted on Collard's alleged default within the statutory period. The Trust, on the other hand, was not barred by the limitations period because the mortgage payments on the property had been continuous and were still being made. The district court granted the Trust's cross-motion for summary judgment to quiet title and ordered Nagle to deliver to an escrow agent a special warranty deed to the Trust. The district court then ordered that the Trust receive the title upon complete payment of the mortgage. The Trust's claim seeking attorney fees was denied.

¶ 9 After the district court's ruling, the Trust paid the balance of the mortgage and received title from the escrow agent. It subsequently sold the property to a third party, a Collard family member. The property appraised for $250,000 and was sold for approximately $230,000.

¶ 10 Nagle appealed the district court's decision to the Utah Court of Appeals, contending that summary judgment in favor of the Trust was erroneous because Collard had received the property without paying the full purchase price contemplated by the UREC and its addenda. See Collard v. Nagle, 2002 UT App 306, ¶ 17, 57 P.3d 603. The Trust cross-appealed for attorney fees. Id. ¶ 1. The court of appeals reversed the summary judgment, holding that there was a material dispute of fact as to whether the stock transferred to Nagle reached the $85,000 value required by the contract during the relevant time. Id. ¶ 21. The court of appeals further noted, however, that "[b]ecause [the Trust] has already sold the property at issue, all that remains for a remedy for [Nagle] is a monetary award. Thus, the concept of offset is easily applied to the facts of this case, and the trial court can fashion a remedy after any factual issues are resolved." Id. ¶ 26. To that end, the court of appeals gave the following specific instructions to the trial court:

> If, on remand, the fact finder determines that the 55,000 shares were worth at least $85,000.00 at some point in time between September 18, 1979 and September 18,

---

established that Collard transferred additional shares in order to permit Nagle to realize the $85,000 contemplated by Addendum 2. Nagle's testimony disputed this version of events, but the trial court specifically rejected that testimony.

4. Leroy Collard died on February 8, 1997. The Trust is his successor-in-interest.

1980, and that [Nagle] was obligated to sell the shares at that time, then [the Trust] has performed [its] obligations and [Nagle] is not entitled to further relief. However, if the fact finder determines that the shares did not reach a value of $85,000.00 within the appointed period, then [Nagle] is entitled to offset the amount of the shortfall [Collard] was obligated to pay in cash or additional shares against the value of the property.

*Id.* ¶ 27.

¶ 11 Thus, on remand, the sole question for the trial court was the amount, if any, of an offset due to Nagle as a result of a shortfall between the actual value of the shares he received and the amount due to him under the contract. The court of appeals' decision cut off any claims by Nagle to title to the property, which by that time had vested in a third party.

¶ 12 On remand, the parties introduced conflicting evidence regarding the value of the shares during the period between September 18, 1979, and September 18, 1980. The district court determined that in order for the 105,000 shares to yield $85,000, the price per share had to reach $0.81 during the relevant time period. Given that the stock prices fluctuated extensively, the district court found the evidence insufficient to conclude that the price per share had, in fact, reached $0.81. The district court did find that an average price of $0.50 per share was obtainable during that year. It thus ordered the Trust to pay an offset of $32,550 [5] to Nagle. As to attorney fees, the district court held that because an equitable remedy had been fashioned and neither Nagle nor the Trust had "fully and substantially prevailed," neither party was entitled to fees. Nagle now appeals from the decision of the district court. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(j) (2002).

## ANALYSIS

■ ¶ 13 The issue before us is whether the district court abused its discretion in fashioning the equitable remedy represented by the offset award. When a district court fashions an equitable remedy, we review it to determine whether the district court abused its discretion. *See Morris v. Sykes,* 624 P.2d 681, 684 (Utah 1981). This standard recognizes "the district court's [unique] ability to balance facts and craft equitable remedies and our [corresponding] hesitance to act as a Monday morning quarterback in such matters." *Parduhn v. Bennett,* 2005 UT 22, ¶ 23, 112 P.3d 495. Reviewing the district court's decision under this standard, we conclude that the district court did not abuse its discretion in this case. We review Nagle's challenges to the decision in sequence.

■ ¶ 14 Nagle first argues that the trial court improperly granted specific performance to the Trust without a finding of fact that the stock shares reached the requisite $85,000 value within one year. As noted above, the court of appeals determined that only a monetary remedy, not specific performance, was at issue on remand, and the trial court followed its instructions. Nagle did not seek certiorari review of the court of appeals' decision on the nature of the available remedies, and the trial court was not at liberty to ignore the appellate court's mandate. In other words, the trial court's only option was to determine whether an offset was owing and in what amount. Specific performance was impossible given that the Trust had already transferred title. Although Nagle argues before this court that the transfer was "inequitable," he made no effort to have it set aside by petitioning for certiorari review of the court of appeals' decision. In any event, the trial court's factual findings on the fairness and reasonableness of the transfer to the third party, which we discuss below, are determinative.

■ ¶ 15 Second, Nagle argues that since the stock he received never reached the $85,000 level and thus never triggered his obligation to sell, the trial court's calculation of the offset amount was erroneous. This argument is also precluded under the decision of the court of appeals. The trial court's

---

5. The district court arrived at this amount by subtracting the average value of the stock during the relevant year—$0.50 multiplied by 105,000, or $52,500—from the amount due under the contract—$0.81 multiplied by 105,000, or $85,050.

determination followed the appellate court's specific directions regarding the method for determining and calculating an offset. Furthermore, the trial court examined the equities and determined that Nagle "was 'speculating' in the stock value, and did nothing to attempt to sell even a portion of the stock when it would have realized some value had he done so," and also that the stock "could have often [at varying points during the year] been sold for very near, in all likelihood, the value needed to achieve $85,000." Nagle's argument thus fails on the facts found by the trial court, which are supported by the evidence.

¶ 16 Nagle's third argument challenges the trial court's factual determination that 105,-000, rather than 55,000, shares were transferred by Collard pursuant to the contract. The trial court specifically indicated in its Memorandum Decision that it disbelieved Nagle's testimony claiming that the additional shares it received over and above the 55,000 referenced in the contract were part of a separate transaction. We defer to such findings of fact by trial courts, and the court's finding in this instance is amply supported by the evidence.

¶ 17 Nagle next asserts that the trial court erred in concluding that the Trust's conveyance of the property to a third party was not inequitable. Once again, under the abuse of discretion standard, the trial court's review of the evidence is entitled to deference. Here the trial court heard testimony regarding the appraised value of the property, the condition of the real estate market, and the effect on marketability of a lis pendens filed by Nagle. It concluded that the sale by the Trust was reasonable and not inequitable. That conclusion is wholly supported by the evidence.

¶ 18 The final two issues raised by Nagle on appeal relate to the trial court's denial of prejudgment interest on the amount of the offset awarded to Nagle and of attorney fees to Nagle as a prevailing party. As to the first question, the trial court correctly concluded that the offset amount could not have been known prior to the presentation of evidence on the value of the shares, was part of an equitable allocation of obligations between the parties, and was thus not eligible for prejudgment interest. Likewise, the trial court was correct in determining that Nagle's remedy here was equitable, not awarded under the contract, and therefore not eligible for attorney fees. The trial court further held, correctly, that "neither defendant nor plaintiff has fully and substantially prevailed," and therefore no fees were warranted in any event.

¶ 19 The decision below is affirmed in all respects.

¶ 20 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.